CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
June 26, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Pro-Lift Doors Franchise, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00087 |
| | ) | |
| Arukah LLC *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

In March 2020, a garage door company signed a franchise agreement with a franchisee to license its business systems and services. Five years of declining sales, contentious communications, and missed payments later, the garage door company, a franchisor, terminated the agreement and now brings this breach of contract action against the franchisee. Pro-Lift Doors Franchise, LLC ("Pro-Lift") claims that Defendants Arukah LLC ("Arukah") and its current or previous owners, Chris Finch and Miles Ghorley, failed to comply with several of their obligations under the franchise agreement. Defendants now move to dismiss Pro-Lift's amended complaint, (Dkt. 16), arguing that many of Pro-Lift's allegations are insufficient or are based on a flawed reading of the franchise agreement. For the reasons stated below, the court will grant in part and deny in part the motion.

## I.    Background[1]

### A. Factual History

On March 5, 2020, Pro-Lift and Arukah executed a franchise agreement ("Franchise Agreement" or "Agreement") governing their business relationship for approximately ten years.  (Am. Compl. ¶ 11 (Dkt. 14); *see* Franchise Agreement (Dkt. 14-1).)   Under the Agreement, Pro-Lift licensed its garage door installation and repair system, marketing and other services, and intellectual and other intangible property to Arukah in exchange for royalties and various fees.  (Am. Compl. ¶ 11.)  As part of the Franchise Agreement, Finch and Ghorley signed the Guaranty Agreement for Arukah's performance and payment in their individual capacities.  (*Id.* ¶¶ 10, 15; Franchise Agreement at 72–75.)

The first alleged violation of the Agreement occurred in August 2021, when Finch allegedly assigned his membership interest (85%) in Arukah to Ghorley, who held the remaining 15% interest.  (Am. Compl. ¶¶ 12–13, 16.)  The assignment took place without Pro-Lift's knowledge or consent, in violation of Section 19.2 of the Franchise Agreement.  (*Id.* ¶¶ 14, 16.)   After the assignment, Finch "disassociated himself from the company . . . stopped participating in its daily operation and did not contribute to the company's continued growth." (*Id.* ¶ 17.)  Finch's failure to participate in the franchise caused Arukah to sustain financial losses and to lag behind Pro-Lift's benchmarks through the first five years of the Agreement. (*Id.* ¶¶ 17–19.)  When Pro-Lift advised Finch in September 2025 that the assignment of his

---

[1] The facts alleged in Pro-Lift's amended complaint and supporting exhibits are accepted as true when evaluating whether the amended complaint states a claim upon which relief may be granted.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

interest was in violation of the Franchise Agreement, Finch responded to Pro-Lift that "he was permitted to transfer his membership [to Gorley] by Arukah's operating agreement." (*Id.* ¶ 14.)

As Arukah's gross sales declined, Pro-Lift remained available to Ghorley to provide "sales training, individual coaching, and business operation resources" and adjusted Arukah's royalty payment schedule to supply "additional relief and cash flow for Arukah and Ghorley." (*Id.* ¶ 20.)    On May 22, 2025, representatives from Pro-Lift's parent company met with Ghorley, and Ghorley left the meeting purportedly frustrated that Pro-Lift would not waive royalty payments indefinitely.  (*Id.* ¶ 21.)  After that meeting, Ghorley stopped communicating with Pro-Lift.  (*Id.* ¶ 22.)  Ghorley also stopped attending "scheduled monthly meetings with Pro-Lift" and stopped responding to any e-mails or chat messages from Pro-Lift regarding Arukah's performance as a franchisee.  (*Id.*)  Along with the communications, Arukah's royalty payments to Pro-Lift also stopped.  (*Id.* ¶ 23.)

On September 15, 2025, Pro-Lift sent Defendants a Notice of Default, which identified Defendants' failure to pay royalties and other fees under the Agreement and gave notice of the 10-day cure period under Section 22.3(i)(a).  (*Id.* ¶¶ 24–25.)   In response, Ghorley maintained that the "business was no longer viable in his market" and that "neither he nor Arukah would pay [Pro-Lift] any royalties from sales produced by the business."  (*Id.* ¶ 26.) On October 10, Pro-Lift notified Defendants that it had terminated the Agreement based on Defendant's material breach.  (*Id.* ¶ 27.)

The Franchise Agreement contains several post-termination obligations for the franchisee, including, but not limited to, returning confidential materials, ceasing to operate under the Pro-Lift name, paying any unpaid royalties and fees, and paying the franchisor a bond to ensure any obligations to the franchisee's customers are honored. (*Id.* ¶¶ 28–29.) According to Pro-Lift, Defendants did not satisfy those obligations. (*Id.*)

## B. Procedural History

On November 3, 2025, Pro-Lift filed a complaint against Defendants. (Dkt. 1.) After Defendants moved to dismiss on December 30, Pro-Lift filed an amended complaint as of right on January 20, 2026. (Dkt. 7; Dkt. 14.) Pro-Lift alleges one count: a breach of Sections 4.2, 4.6, 4.7, 5.3, 19.2, and 23.1 of the Franchise Agreement, (*id.* ¶¶ 30, 37) and asks for compensatory damages and attorneys' fees, (*id.* at 12–13). Defendants moved to dismiss the amended complaint on February 3, (Dkt. 16), and Pro-Lift filed its opposition two weeks later, (Dkt. 19). Defendants did not file a reply brief.

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616. At the motion to dismiss stage, the court may consider exhibits attached to a complaint as part of the pleadings if they are integral to the complaint and there is no dispute about their authenticity. *See* Fed. R. Civ. P. 10(c); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

### III.    Analysis

Pro-Lift alleges a single count for breach of the Franchise Agreement against all Defendants. (*See* Am. Compl. ¶¶ 35–38.) More specifically, Pro-Lift claims that Defendants failed to comply with their contractual obligations under Sections 4.2, 4.6, 4.7, 5.3, 19.2, and 23.1. (*Id.* ¶¶ 30, 37.) Defendants contend that Pro-Lift fails to state a claim for breach. The court will analyze the alleged breaches in turn below.

As a federal court sitting in diversity jurisdiction, the law of the forum state— Virginia—controls. *Kritter v. Mooring*, 142 F.4th 267, 273 (4th Cir. 2025). "Under Virginia law, courts enforce the choice-of-law rules that the parties expressly contracted into." *Philpot v. Indep. J. Rev.*, 92 F.4th 252, 264 (4th Cir. 2024) (citing *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021)). Here, the Franchise Agreement's choice of law provision states that the Agreement shall be governed by Virginia law (Franchise Agreement, § 30.1) and the parties do not dispute that Virginia law applies here.

To state a claim for breach of contract in Virginia, Pro-Lift must show "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (2004)). Pro-Lift must also "allege facts setting forth the injury or damage incurred as a result of defendant's breach." *Id.* (citing *Squire v. Va. Hous. Dev. Auth.*, 758 S.E.2d 55, 61 (Va. 2014)).

Under Virginia law, courts must interpret a contract in accordance with its plain meaning. *Mgmt. Enters., Inc. v. Thorncroft Co.*, 416 S.E.2d 229, 231 (Va. 1992). Additionally, when considering the plain meaning of a contract, courts should construe the contract as a whole. *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 244 (Va. 2016). In doing so, the court will harmonize contractual provisions with one another and "giv[e] effect to each when reasonably possible." *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013).

## A. Section 4.2 (Royalties)

Plaintiff alleges that Defendants breached Section 4.2 of the Franchise Agreement by failing to pay royalties owed to Pro-Lift, and that those royalties accrued both before and after Pro-Lift terminated the Franchise Agreement. (Am. Compl. ¶¶ 23, 29–31, 37.) Section 4.2 provides, in relevant part:

> During the term of this Agreement, Franchisee shall pay to Franchisor a non-refundable royalty (the "Royalty," "Royalty Fee" or "Royalties") out of the Gross Sales (as herein defined) arising from or in connection with the operation of the Business, equal to the greater of six percent (6%) of Gross Sales or a minimum royalty fee as set forth in the table below . . . Royalties are payable throughout the entire term of this Agreement after the Franchisee begins

presales even if the franchised business has no revenue. . . . Royalties shall be due and payable weekly[.] . . . [I]f Franchisee breaches the Agreement and does not cure the breach within the time set forth in Franchisor's Notice of Default, Franchisee shall pay Franchisor royalties at the rate of Ten Percent (10%) of Gross Sales until such time as the default at issue is cured or Franchisor, at its sole discretion, chooses to terminate this Agreement.

(Franchise Agreement, § 4.2.)  Defendants argue that Section 4.2 does not provide for any post-termination royalties, and that Pro-Lift failed to "allege any facts showing how pre-termination [royalties] became due or how Defendants failed to pay them."  (Defs.' Br. at 12–15 (Dkt. 16-1).)

   1.  *Pre-Termination Royalties*

The plain language of Section 4.2 obligates Defendants to pay royalties "during the term of [the] Agreement."  (Franchise Agreement, § 4.2.)  Pro-Lift alleges that Defendants refused to pay royalties soon after a May 22, 2025, meeting between the parties, and that Pro-Lift sent a Notice of Default to Defendants on September 15, 2025, notifying them of unpaid royalties and other fees totaling $13,519.88.  (Am. Compl. ¶¶ 22–24; Pl.'s Resp. at 7 (Dkt. 19); Dkt. 14-2.)  In the weeks following the notice, according to Pro-Lift, "Defendants did not pay Pro-Lift or otherwise attempt to cure their default."  (Am. Compl. ¶ 26.)  Instead, "Ghorley claimed that the business was no longer viable in his market" and "informed Pro-Lift that neither he nor Arukah would pay any future royalties from sales produced by the business." *Id.*

Virginia adheres to the "plain meaning" rule and gives meaning to every clause in a contract. *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1083 (E.D. Va. 2011).  When reviewing a contract, the court will give words "their usual, ordinary, and popular

- 7 -

meaning." *Id.* And the court will presume that the parties did not include meaningless contract provisions. *Road King Dev., Inc. v. JTH Tax LLC*, 657 F. Supp. 3d 780, 791 (E.D. Va. 2023). The contract should be read as a whole, and the court should not "strain to find ambiguities" or "examine certain specific words or provisions in a vacuum." *Res. Bankshares Corp. v. St. Paul Mercury Ins.*, 407 F.3d 631, 636 (4th Cir. 2005). "A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002). It is "only ambiguous when it is subject to multiple interpretations in view of the entire contractual context." *Danville, VA (1431 S Bos.) LLC v. Starbucks Corp.*, No. 6:26-cv-00047, 2026 WL 1623487, at *4 (W.D. Va. June 5, 2026) (quoting *James River Ins. v. Doswell Truck Stop, LLC*, 827 S.E.2d 374, 376 (Va. 2019) (cleaned up)).

In their briefs, the parties offer two opposing interpretations of Section 4.2's royalty requirements during the term of the Agreement. But, because Defendants are the moving party, the court need only consider whether their interpretation of Section 4.2 is unambiguously supported by the Franchise Agreement at this stage.[2] *See id.* at *4–5. Defendants interpret Section 4.2 to only require royalty fees to be paid if Gross Sales are generated. (*See* Defs.' Br. at 14 ("Plaintiff must plead facts showing . . . the existence of Gross Sales giving rise to royalty obligations under Section 4.2 . . . .").) This interpretation, however, would render other parts of Section 4.2 meaningless, like the provision stating that "[r]oyalties

---

[2] To the extent that Defendants argue that Section 4.2's terms are ambiguous, such an argument is not appropriately resolved at the motion to dismiss stage. *See Danville, VA (1431 S Bos.) LLC v. Starbucks Corp.*, No. 6:26-cv-00047, 2026 WL 1623487, at *5 (W.D. Va. June 5, 2026) (citing *Va. is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 439 n.7 (E.D. Va. 2024)).

are payable throughout the entire term of the Agreement . . . even if the franchised business has no revenue," and the table providing "Monthly Minimum Royalty Fee[s]." (Franchise Agreement § 4.2.) "Virginia law requires that an interpretation of a contract not render a term meaningless." *Adolf Jewelers, Inc. v. Jewelers Mut. Ins. Co.*, 614 F. Supp. 2d 648, 656 (E.D. Va. 2008) (citing *City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc.*, 628 S.E.2d 539, 541 (Va. 2006)).

Additionally, while Section 4.2 appears to tie royalties to Gross Sales, it also provides in the alternative for monthly minimum royalty payments if the royalty amounts based on Gross Sales fall below a minimum number. (Franchise Agreement, § 4.2.) Section 4.2 clearly states that royalties are "due and payable weekly," and Pro-Lift's Notice of Default in September constitutes a demand for payment. (*See id.*; Dkt. 14-2.) Section 23.1 requires the franchisee to pay unpaid royalty fees to the franchisor upon termination of the Agreement, (Franchise Agreement § 23.1(iii)), and Pro-Lift alleges that Defendants never paid those royalties, (Am. Compl. ¶¶ 23, 28). Accepting Pro-Lift's allegations as true and drawing inferences in its favor, the court finds that Pro-Lift sufficiently pleaded the existence of a pre-termination royalty obligation, Defendants' breach of that obligation, and damage to Pro-Lift caused by that breach.

Accordingly, the court must reject Defendants' interpretation and deny their motion to dismiss as to unpaid pre-termination royalties under Section 4.2.

2. *Post-Termination Royalties*

Post-termination royalties are a different story. "An ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Cox v. Snap, Inc.*, No. 1:16-cv-00009, 2016 WL 5109518, at *5 (E.D. Va. Sep. 20, 2016) (quoting *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 683 S.E.2d 517, 526 (Va. 2009)). The court finds that there is no ambiguity in the post-termination obligations under the Franchise Agreement.

Section 4.2 does not create any royalty obligations that accrue after the Franchise Agreement is terminated. The Section states that the franchisee shall pay the franchisor regular weekly royalty payments of the greater of 6% of Gross Sales or the listed minimum payment "[d]uring the term of this Agreement." (Franchise Agreement, § 4.2.) Defendants' weekly royalty obligations therefor ceased to accrue at termination of the Agreement.

If the franchisee breaches the agreement, it is obligated under Section 4.2 to pay the franchisor weekly royalties at an increased rate of 10% *until* either (1) the franchisee cures the default within the noticed time frame or (2) the franchisor chooses to terminate the Agreement. (*Id.*) Here, the amended complaint clearly states that Pro-Lift chose to terminate the Agreement on October 10, 2025, after Defendants failed to cure their default. (*See* Am. Compl. ¶¶ 26–27; Dkt. 14-3.) Even if Defendants had obligations to pay increased royalties for any period, those increased royalties stopped accruing once Pro-Lift terminated the Agreement. Pro-Lift's contention that post-termination royalties would subsequently "be calculated by reference to the normal royalty rate or their minimums," (Pl.'s Resp. at 9), ignores

the first sentence of Section 4.2—that the regular royalties shall be paid "[d]uring the term of [the] Agreement."  (Franchise Agreement, § 4.2.)  Finally, Section 23.1, which governs "Obligations upon Termination or Expiration," requires franchisee to "pay all sums owing to Franchisor . . . including . . . unpaid Royalty Fees," but does not create any *new* royalty obligations that accrue after the Agreement is terminated.  (*See id.* § 23.1.)  The court thus finds that the plain and unambiguous language of the Franchise Agreement does not impose any obligation to pay royalties accrued after termination of the contract.  Accordingly, the court will grant Defendants' motion to dismiss as to unpaid royalties accruing post-termination.

### B.  Sections 4.6 (Call Center Fee) and 4.7 (Technology Fee)

Pro-Lift alleges that Defendants failed to pay call center and technology fees under Sections 4.6 and 4.7, respectively, of the Franchise Agreement—accruing both before and after the Agreement was terminated.  (Am. Compl. ¶¶ 31–32, 37.)  Defendants argue that Pro-Lift failed to "plead the underlying facts necessary to show how these amounts accrued . . . or to connect those sums to particular breaches."  (Defs.' Br. at 14.)  Just like the royalty payments, the court finds that Pro-Lift states a claim for fees accrued before the Agreement was terminated but fails to state a claim for fees accrued after termination.

1.  *Pre-Termination Fees*

Pro-Lift alleges that Defendants failed to pay fees under Sections 4.6 and 4.7 from June 2025 to October 10, 2025, when the Agreement was terminated.  (Am. Compl. ¶ 31.)  Sections 4.6, 4.7, and 5.1 outline the fee amounts and the weekly payment obligations.  (Franchise Agreement §§ 4.6, 4.7, 5.1.)  Pro-Lift's Notice of Default sent to Defendants in September

2025 includes notice that Defendants were in "direct violation" of Sections 4.6 and 4.7. (Dkt. 14-2.) Section 23.1 requires the franchisee to pay unpaid fees to the franchisor upon termination of the Agreement, (Franchise Agreement § 23.1(iii)), and Pro-Lift alleges that Defendants never paid those fees, (Am. Compl. ¶ 31). Thus, the court finds that Pro-Lift sufficiently states a claim that Defendant breached Sections 4.6 and 4.7 with respect to call center and technology fees accrued before the Franchise Agreement was terminated. Accordingly, the court will deny Defendants' motion to dismiss as to unpaid call center and technology fees that accrued before the Agreement was terminated.

2. *Post-Termination Fees*

The plain language of the Franchise Agreement does not, however, appear to provide for the accrual of call center and technology fees after the Agreement is terminated. Sections 4.6 and 4.7 provide:

> 4.6 Call Center Fee. Franchisee shall pay Franchisor a $125 per week or 1% of Gross Sales per week (whichever is greater) Call Center Fee. The Call Center Fee will be collected weekly.

> 4.7 Technology Fee. Franchisee shall pay Franchisor an initial Technology Fee of $2,500.00 upon signing this Agreement, and a weekly technology fee of $75.00.

(Franchise Agreement §§ 4.6, 4.7.) Pro-Lift asserts that it terminated the Agreement on October 10, 2025. (Am. Compl. ¶ 27.) And Pro-Lift does not point to any provision in the Agreement that calls for the accrual of call center or technology fees after the Agreement is terminated, nor could the court find any.

The Franchise Agreement devotes a section to "Effect of and Obligations Upon Termination." (Franchise Agreement § 23.) While it calls for the franchisee to pay "unpaid . . . fees . . . due to Franchisor," it does not mention *further accrual* of call center and technology fees, or any weekly fees for that matter, after the Agreement is terminated. (*See id.* § 23.1(iii).) And the omission of a contractual term conveys an intent to exclude it. *First Nat'l Bank v. Roy N. Ford Co.*, 252 S.E.2d 354, 357 (Va. 1979). Further, Section 23 requires the franchisee to "immediately cease to operate" upon termination of the Agreement. (Franchise Agreement § 23.1(ii).) Harmonizing the reading of Sections 4.6, 4.7, and 23.1, the court finds that the Franchise Agreement does not provide for the accrual of call center and technology fees after the Agreement is terminated.[3] *See, e.g.*, *Sweely Holdings, LLC v. SunTrust Bank*, 820 S.E.2d 596, 601 (Va. 2018) ("All of the different parts of an agreement must be viewed together, i.e., as a whole, and each part interpreted in the light of all of the other parts." (citation omitted)). Pro-Lift therefore fails to state a claim for breach of contract as to the call center and technology fees allegedly accrued post-termination. Accordingly, the court will grant Defendants' motion to dismiss as to this claim.

## C. Section 5.3 (Late Payments and Insufficient Funds)

Pro-Lift suggests "on information and belief" that Defendants breached Section 5.3 of the Franchise Agreement when Finch "provided a stop payment direction to Arukah's financial institution in June 2025." (Am. Compl. ¶ 30.) Section 5.3 of the Franchise

---

[3] Further, to the extent that the amended complaint could be construed to allege that Defendants owe post-termination call center and technology fees *because* they continued to use those services after the Agreement was terminated, Plaintiff fails to state such a theory under a breach of contract claim.

Agreement outlines consequences for overdue payments and for any requests for payment that are not honored by the franchisee's financial institution.  (Franchise Agreement § 5.3.) But it does not contain any language prohibiting the franchisee from requesting a stop payment.  (*See id.*)  Accordingly, Pro-Lift fails to state a claim for breach of Section 5.3, and the court will grant Defendants' motion to dismiss as to any alleged breach of Section 5.3.

### D. Section 19.2 (Assignment by Franchisee)

Pro-Lift further alleges that Defendants violated Section 19.2 of the Franchise Agreement when Finch assigned his membership interest in Arukah to Ghorley in August 2021.  (Am. Compl. ¶¶ 14, 16.)  Defendants contend that Pro-Lift fails to "provide any factual allegation" about the alleged 2021 transfer.  (Defs.' Br. at 16.)

The court finds that Pro-Lift carried its burden at the motion to dismiss stage.  Pro-Lift claims that the alleged transfer of Finch's interest in the company without Pro-Lift's consent occurred in August 2021, (Am Compl. ¶¶ 13, 16); that Finch "disassociated himself from the company" after the transfer, (*id.* ¶ 17), which decreased Defendants' company's sales and subsequent royalties to Plaintiff, (*id.* ¶¶ 18–19); that Finch acknowledged the transfer when he responded that "he was permitted to transfer his membership interest by Arukah's operating agreement," (*id.* ¶ 14); and that Section 19.2 of the Agreement "expressly prohibits the transfer of an equity interest in the franchisee entity," (*id.* ¶ 14).  These allegations are sufficient to show that Defendants had an obligation under the Agreement not to transfer an interest in the company, that they breached that interest, and that the breach caused damage to Pro-Lift.  *See Ramos*, 770 S.E.2d at 493 (requiring that a plaintiff alleging a breach of contract

claim show "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation").  Accordingly, the court will deny Defendants' motion to dismiss as to the alleged breach of Section 19.2.

### E.  Section 23.1 (Obligations Upon Termination or Expiration)

Pro-Lift alleges that Defendants breached numerous provisions of Section 23.1 of the Franchise Agreement, which governs Defendants' obligations to Pro-Lift after the Agreement is terminated.  (Am. Compl. ¶¶ 28, 33–34, 37.)  Besides claims for unpaid royalties and various fees under Section 23.1(iii), Defendants appear to only move to dismiss Pro-Lift's claim as to Section 23.1(xi).  (Defs.' Br. at 20, 22–24.)  Section 23.1(xi) provides that the franchisee shall:

> fulfill all of Franchisee's obligations to customers under all outstanding contracts and any warranties provided for in this Agreement notwithstanding the expiration or termination of the same.  In order to ensure that Franchisee honors these obligations, within fourteen (14) days after the effective date of expiration or termination, Franchisee shall post a bond in an amount equal to one half of one percent (0.5%) of Franchisee's gross sales for the last twenty-four (24) months or pay Franchisor a fee of ten thousand dollars ($10,000), whichever is greater.  Franchisor shall return such monies, less any amount expended to satisfy Franchisee's outstanding obligations, upon Franchisor's satisfaction that Franchisee has satisfied all of its obligations pursuant to this subsection.

(Franchise Agreement § 23.1(xi).)

Pro-Lift alleges that Defendants failed to pay "a $10,000 fee within fourteen (14) days of the termination of the Franchise Agreement to secure Defendants' outstanding contracts and warranties owed to Pro-Lift customers as required by Section 23.1(xi)."  (Am. Compl. ¶ 28.)  But to sufficiently allege a breach of this contract term, Pro-Lift must "allege facts

setting forth the injury or damage incurred as a result of defendant's breach." *Ramos*, 770

S.E.2d at 493 (explaining that the plaintiffs' breach of contract claim failed at the pleading

stage because they "failed to set forth a single factual allegation of any injury or damage they

incurred as a result of [the defendant's] alleged breach").  Here, Pro-Lift fails to allege any facts

to suggest it was injured in any way by Defendants' failure to fulfill their obligations to

customers under outstanding contracts, which is the reason why the term requires posting of

a bond payment within 14 days of the Agreement's termination.  The Agreement provides for

such a payment "to ensure that Franchisee honors [its] obligations" to its customers after the

Agreement is terminated.  (Franchise Agreement § 23.1(xi).)  And the franchisor is required to

eventually return the payment "less any amount expended to satisfy Franchisee's outstanding

obligations."  (*Id.*)  Pro-Lift does not allege any obligations that franchisee owed to its

customers upon termination, any failure to honor those obligations, or any expenses that Pro-

Lift incurred fulfilling those obligations.  Plaintiff therefore fails to state a claim for breach of

contract as to Section 23.1(xi).  Accordingly, the court will grant Defendants' motion to

dismiss as to that claim.

* * *

In their motion to dismiss, Defendants contest Pro-Lift's damages theories.  (Defs.' Br.

at 24–27.)  But the court will not consider that argument at this time, as it is not proper for

the court to evaluate a plaintiff's potential damages at the motion to dismiss stage.  *See I-81,

LLC v. Felher Transp., Inc.*, No. 5:25-cv-00031, 2025 WL 2484196, at *8 (W.D. Va. Aug. 28,

2025) ("The motion to dismiss stage is not the appropriate phase of litigation to challenge a

plaintiff's damages calculation.") (quoting *Three Rivers Landing of Gulfport, LP v. Three Rivers Landing, LLC*, No. 7:11-cv-00025, 2012 WL 1598130, at *6 (W.D. Va. May 4, 2012) (cleaned up)).

### IV.    Conclusion

For the above reasons, the court will grant in part and deny in part Defendants' motion to dismiss, (Dkt. 16).  The court will grant the motion as to Pro-Lift's allegations that Defendants breached the Agreement by failing to pay royalties, call center fees, and technology fees accruing after the Agreement was terminated; by failing to pay a warranty payment under Section 23.1(xi); and by ordering a stop payment in violation of Section 5.3.  The court will deny the motion as to Pro-Lift's allegations that Defendants breached the Agreement by failing to pay royalties, call center fees, and technology fees accruing before the Agreement was terminated, and by transferring a membership interest in Arukah without Pro-Lift's consent.

An appropriate Order will issue.

**ENTERED** this 26th day of June, 2026.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE